# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2016

## STATE OF TENNESSEE v. BELINDA POTTER

**Appeal from the Circuit Court for Madison County**
**No. 14-637     Paul G. Summers, Senior Judge**

---

**No. W2015-01164-CCA-R3-CD  -  Filed March 24, 2016**

---

The defendant, Belinda Potter, pled guilty to theft of property valued at $60,000 or more, a Class B felony, and was sentenced as a Range I, standard offender to nine years in the Department of Correction and ordered to pay $55,809.69 in restitution.  On appeal, she argues that the trial court erred in denying alternative sentencing.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant Public Defender, for the appellant, Belinda Potter.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At the April 20, 2015 plea submission hearing, the State recited the facts it would have presented had the case gone to trial:

> [T]he State would show in the one count of the indictment that between the dates of June of 2012 and September of 2014, while here in Madison County, that the defendant, Belinda Potter, did knowingly obtain or

exercise control over property over the value of $60,000.00 without the effective consent of the owner, that being the law firm of Redding, Steen, and Stat[o]n, with the intent to deprive them of that property.

. . . [T]he defendant was an employee of the victim law firm, Redding, Steen, and Stat[o]n.  She was the office manager of the law firm.

In her position as office manager, she controlled or had access to accounts of the firm, including a credit card that was to be used for . . . the benefit of the law firm.  She exercised control over that account and opened the card between the dates of her employment and that being the June 2012 until the time that this was discovered in September of 2014.

During that period, in a time in which she was authorized to use the card only for law firm purposes, she used them for [her] own personal benefit without the authorization of the firm and used that card several times over that period.

She also during that period was able to evade detection by the CPA.  This came to light at the law firm from specifically Ms. Sadia Staton . . . .  She's an attorney at the firm – she noticed that there was a discrepancy with the law firm's AT&T account.  AT&T had contacted her about an account that did not get paid.  They believed that it had been paid.  In looking at the accounts, the accounts appeared to have been altered.  Those accounts and the recordkeeping w[ere] actually under the control of [the defendant], that's how she was able to sort of cover her tracks . . . during the course of this.

There was – in fact, the firm had contacted Ms. Rachel Depriest, who's a CPA.  She indicated originally that she didn't notice anything suspicious or unusual about the bank statements.  Of course, the bank statements had been altered.

Investigators with the Jackson Police Department were notified about the discrepancy.  They actually interviewed [the defendant].  [The defendant] gave a confession to Investigator Roger Sain with the Jackson Police Department stating that she did have financial hardships and that she had some extra expenses.

2

The prosecutor then read the defendant's statement, wherein she admitted she took approximately $60,000 from her employer. However, after an audit was conducted by the law firm, the actual loss was determined to be $80,397.04.

At the May 26, 2015 sentencing hearing, Valerie Viers, a presentence report writer with the Department of Correction, testified that she prepared the defendant's presentence report and had previously prepared a post-sentence report for the defendant, which she incorporated into the presentence report. The victim impact statement submitted in this case contained information that the defendant had previously embezzled money from another attorney employer, resulting in the suspension of his law license. The defendant was not prosecuted in that matter.

Ms. Viers said that the victims reported that of the $80,397.04 taken by the defendant, the firm was only reimbursed $24,000 from its insurance company. The defendant's prior record included a 2004 conviction for theft over $10,000 in Haywood County, for which she received a five-year suspended sentence and was ordered to pay $58,479.28 in restitution. Her probation in that case was extended twice for failure to make payments on the restitution, and she currently owed a balance of $26,000 but had been discharged from probation. In addition, the defendant had numerous convictions for passing worthless checks.

Denise Phillips, the defendant's sister, testified that if the defendant were granted probation, she could live with Ms. Phillips. She said that the defendant had graduated in the top ten of her high school class and attended college for one year. Ms. Phillips acknowledged that the defendant had been convicted for theft in 2004 for taking money from her employer, Spencer Law Firm.

The forty-four-year-old defendant testified that when Ms. Staton confronted her about the bank account discrepancies, she admitted to Ms. Staton she had made unauthorized purchases with the law firm's debit card for personal use. The defendant explained that when she received the monthly bank statements she removed her personal transactions and changed the balances on the computer. She said she made withdrawals to pay for the attorney fees in her son's child custody dispute for his daughter and to buy furnishings and clothing for her other son who was attending college. The defendant expressed remorse for the "bad choices" she had made.

The defendant said she planned to get one or two jobs and make monthly payments toward the restitution in this case and admitted that she still owed $26,000 in restitution in the Haywood County case. She said she wanted to find a job that did not involve financial responsibilities in order to avoid "that temptation." She estimated she could pay between $400 and $500 a month toward restitution in this case.

3

On cross-examination, the defendant explained her prior record of passing worthless checks as "one thing[] l[ed] to another and . . . checks kept getting returned, but I always made sure they were taken care of." Her history of passing worthless checks dated back to 1996, but she said that her financial problems in this case started one to two years earlier. As to her 2004 theft conviction in Haywood County, the defendant said that while working as a real estate paralegal at the Spencer Law Firm, she took money from the real estate transactions she handled. She used the money to cover overdrafts at her bank because she was "focused more on the company . . . [a]nd they had not hired [her] any help, and [she] was working all hours of the night, and [she] was putting more time into their stuff . . . and neglecting [her] personal stuff."

As to the theft in this case, the defendant said that her husband's work hours had been reduced and that she used the law firm's debit card to supplement their income. At one point, she was going to ask the firm for a raise but did not because business was "so bad." She admitted that she continued to take money from the firm even though she knew it was not doing well financially. She said she used the stolen $80,000 to pay "[b]ills, debts, bank drafts."

The trial court called Robert Redding, one of the victims, to testify about the repercussions the law firm had suffered as a result of the defendant's theft. Mr. Redding said that in 2008 the law regarding the filing of medical malpractice suits changed substantially, which caused a decline in their business over the next two years. The victims were "working real hard, but [they] didn't seem to be putting any money in [their] pockets in the same way [they] had before." They had several meetings to discuss how to keep up their cash flow without forgoing their paychecks. The victims subsequently discovered that the defendant's theft was "the largest part" of their financial decline. The firm also owed approximately $20,000 to creditors because the defendant did not mail the checks written to pay the creditors. Mr. Redding said that the victims "weren't living from paycheck to paycheck; [they] were living from no paycheck to no paycheck" as a result of the defendant's theft.

At the conclusion of the hearing, the trial court denied alternative sentencing and sentenced the defendant to nine years in the Department of Correction.

## ANALYSIS

The defendant argues that the trial court erred in denying alternative sentencing, saying that a "period of shock incarceration, followed by intensive supervision, would have fulfilled the goals of sentencing while appreciating the seriousness of [the defendant's] criminal conduct."

4

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

>       (1) The evidence, if any, received at the trial and the sentencing hearing;

>       (2) The presentence report;

>       (3) The principles of sentencing and arguments as to sentencing alternatives;

>       (4) The nature and characteristics of the criminal conduct involved;

>       (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

>       (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

>       (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a

favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

We note that the defendant was convicted of a Class B felony; therefore, she is not considered a favorable candidate for alternative sentencing options. Tenn. Code Ann. §§ 39-14-105(a)(5), 40-35-102(6)(A). The trial court carefully and at length considered the

6

sentencing principles and applied them to the facts of the case. The court noted the defendant's prior Class C felony theft conviction in Haywood County, where she received a five-year sentence of which she served five months and two days before being released on probation and ordered to pay restitution. Her probation in that case was extended multiple times, but the defendant "left owing a considerable amount of restitution unpaid." The court also noted the defendant's six misdemeanor convictions for passing worthless checks and "other criminal misbehavior of stealing yet from another law firm . . . in Madison County, which ultimately resulted in the Board of Professional Responsibility suspending the lawyer for three years from the practice of law because he is accountable for his employee's defalcation." By the trial court's calculations, in the past decade the defendant had stolen over $200,000 from her three law firm employers. Finding that the defendant's efforts of rehabilitation in the past have not succeeded and that to not impose a sentence of confinement would depreciate from the seriousness of the offense, the trial court denied alternative sentencing. We conclude that the record supports the trial court's determination and justifies the imposition of a sentence of confinement.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____

ALAN E. GLENN, JUDGE